JAMES SOULES and Roy Butler, Copartners, Doing Business under the Firm Name and Style of Soules & Butler, v. NORTHERN PACIFIC RAILWAY COMPANY, a Foreign Corporation.

(L.R.A.—, —, 157 N. W. 823.)

Opinion filed January 28, 1916.

**Surface waters — drain — natural servitude — lower estate — rule — civil law — common law.**

1. Both under the civil-law rule as to surface waters and under the so-called common-law or common-enemy rule, a natural drain way must be kept open to carry the water into the streams, and the lower estate is subject to a natural servitude for that purpose.

---

Note.—In addition to the note referred to in the opinion, 22 L.R.A. (N.S.) 789, which discusses the right of the owner of the lower tenement as against the right of the upper landowner to obstruct surface water in a natural drainage channel, see note in 21 L.R.A. 598, on the correlative rights as to obstruction of surface water.

On the right of lower proprietors to obstruct the flow of surface water, see note in 16 Am. St. Rep. 710.

**Natural drain way — ditch — channel — surface waters — jury — findings of.**

2. Proof that a drain or ditch receives the surface water of a drainage area of some 168 acres, is several feet in depth, has a well defined channel, and, though it has grass growing at its sides, has a space at the bottom which is worn away by the water to a breadth of 3 or 4 feet, and that such drain or ditch serves to convey the waters of the area into a river or stream, will justify the jury in holding that such drain or ditch is a natural drain way or drainage channel, and this though there is no evidence that the water ran in the same at all times, but merely that the drain or ditch served to convey the melting snows and surface waters.

**Lower landowner — duty of — building structure across drain — obstruction.**

3. It is the duty of a lower landowner who builds a structure across a natural drain way to provide for the natural passage, through such obstruction, of all of the water which may be reasonably anticipated to drain therein, and this is a continuing duty.

**Natural drain way — obstructed — evidence of — by lower landowner — upper landowner — flooding of lands — damages — surface water — unnatural amount — occasioned by storm — proof — burden of.**

4. Where there is evidence which tends to show that a drain way is a natural drain way, and that it has been obstructed by a lower landowner, and that such obstruction occasioned the flooding of and injuries to the property of an upper landowner, the burden of proof is upon the defendant or lower landowner, when sued for such damages, to prove that the storm which occasioned the flood was unprecedented; that it could not have been reasonably anticipated, and need not have been provided against.

**Storm — unprecedented — evidence of — jury — question for.**

5. Evidence examined, and *held* not to be such as to justify a holding, as a matter of law, that the storm in question was so unprecedented that it should not have been anticipated, but rather that the fact was one for the jury to pass upon.

**Floods — unprecedented — unusual occurrence — anticipated — community — people — experience of.**

6. Extraordinary or unprecedented floods are floods which are of such unusual occurrence that they could not have been foreseen by men of ordinary experience and prudence. Ordinary floods are those, the occurrence of which may be reasonably anticipated from the general experience of men residing in the region where such floods happen.

**Unprecedented flood — conditions — climatic — topographical — drainage basin — danger — anticipated — provision against.**

7. In passing upon what is or what is not an extraordinary flood, or

whether it should have been anticipated and provided against, the question to be decided is: "Considering the rains of the past, the topographical and climatic conditions of the region, and the nature of the drainage basin as to the perviousness of the soil, the presence or absence of trees or herbage which would tend to increase or prevent the rapid running off of the water, would or should a reasonably prudent man have foreseen the danger and provided against it?"

**Railway company — obstructing natural channel — instructions — damages — measure of — requests.**

8. An instruction in an action against a railway company for negligence in obstructing a natural channel and thereby damaging plaintiff's goods, "that if you believe that the plaintiffs are entitled to recover as heretofore instructed, then it is your duty to determine the amount of damages sustained by reason of the flooding of these premises, and they are entitled to make matters whole," is sufficiently definite as to the measure of damages, in the absence of any requested instructions upon the subject.

**Hardware — stock of — damaged — flood — value — witness — competency — manager — buying and selling — evidence.**

9. One is sufficiently qualified to testify as to the value of a stock of hardware, and to the injury to it by flood and its depreciation in value, who is shown to have worked in a hardware store for at least seven years, to have been manager of such store during such time, and to have had charge of the buying of goods and the fixing of prices at which they should be resold, and to have been in charge of such goods since the damage was done.

**Railway company — damages — culvert — insufficiency — drain — evidence — error — surface water — channel.**

10. Where a railway company is sought to be held liable for damages by flooding occasioned by an insufficient culvert, it is not error to allow in evidence proof of the fact that prior to the construction of the culvert a pile bridge was maintained across the drain in question. Such evidence tends not merely to show the nature of the drain way, its necessity for the carrying away of the surface water which ran therein, but the fact as to whether the drain way was a natural channel or not.

**Railway company — action — damages — culvert — inadequate — cost — proof of.**

11. It is not error, in an action against a railway company for failure to maintain an adequate culvert, to allow proof that such culvert could have been provided at a reasonable cost.

**Railway company — natural drainage — obstructing — culverts — other floods — other premises — proof of — competent.**

12. Where a railway company is sued for obstructing a natural drain way, and not providing sufficient culverts for carrying off the water, it is not error

to allow proof that premises near those of the plaintiffs were flooded in the past, as such evidence tends to show the nature of the drainage district, the course of the water, and generally the necessity of providing for a sufficient outlet for the same.

**Cumulative evidence — extent of — trial court — discretion — floods — other districts — drainage.**

13. The extent to which cumulative evidence may be introduced is largely within the discretion of the trial court; and where there is much evidence in the record as to the nature of a downpour of rain, a case will not be reversed merely because a trial court has excluded evidence that the flood occasioned no injury to premises in a different hollow or drainage basin, although such hollow or drainage basin was close to the one in question.

**Charge of court — considered as a whole — issues — judgment — reversal of — grounds for.**

14. The charge to a jury must be taken as a whole, and where such charge as a whole clearly presents the issues of a case, mere technical defects in portions thereof are not grounds for a reversal of the judgment.

**Expert evidence — conclusiveness — data — formula — basis — drainage — area — culverts.**

15. The conclusiveness of expert evidence depends largely upon the similarity of the data or formula upon which it is based, and proof of the adequacy of a drain for a certain area and that a culvert was constructed in accordance with prescribed formula which were computed on areas of a certain size, is not conclusive as to the adequacy of such culvert unless it is shown that the topography of the drainage areas are similar, it being clear that the flowage even from the same downpour would be much greater in a given time in a hilly basin than on an almost level plain.

Opinion filed January 28, 1916.

Appeal from the District Court of Stark County, *Crawford*, J.

Action to recover damages for the flooding of property occasioned by an insufficient culvert. Judgment for plaintiff. Defendant appeals. Affirmed.

Statement of facts by BRUCE, J.

This is an action to recover damages for the flooding of the plaintiffs' stock of goods which were contained in a retail hardware store in the city of Dickinson, North Dakota. The complaint alleges that the defendant company "on July 28th and for a long time prior thereto owned, operated, and maintained a right of way for its

railroad extending in an easterly and westerly direction in the city of Dickinson; that upon said right of way on said date and for a long time prior thereto, the defendant maintained a high grade or embankment of earth rising several feet above the surrounding surface of the land; that said grade or embankment extended in a generally easterly and westerly direction through the city of Dickinson; that said grade or embankment crosses a natural water course between the freight depot and the passenger depot of the defendant company in such city; that said water course has a well-defined bed and banks, and a stream of water flowing through said water course; that said water course and bed thereof is the natural drainage for surface and storm waters for a large part of the city of Dickinson and surrounding territory, and drains the surface and storm water from a large area; that the premises of the plaintiffs, hereinbefore described, are in the basin drained by said water course; that the defendant company, in constructing said embankment through the city of Dickinson and across said water course and channel of drainage, unnecessarily, carelessly, and negligently entirely filled up and destroyed said water course and channel of drainage, and in the place and stead thereof put through its embankment, part way, a small crooked open ditch and the other part of the way a small iron culvert connecting with said ditch, which said ditch and culvert were entirely insufficient in size and failed to carry off the waters of said water course or storm waters of said drainage area or basin in times of rain, and were so carelessly and negligently constructed and maintained that it entirely failed to carry off said waters; that because of the negligent construction and maintenance of said embankment, the negligent construction and maintenance of said ditch and culvert, and the lack of size, fall, and capacity of said ditch and culvert, on July 28, 1914, storm waters dammed up against said embankment and flowed over and upon the hereinbefore described premises of the plaintiffs; that on July 28, 1914, and for a long time prior thereto, the defendant had notice and knowledge of the fact that said enbankment entirely destroyed said drainage channel, and that said ditch and culvert were insufficient to carry off the waters of said drainage basin and channel in times of rain."

The answer of the defendant was in all respects a general denial, but contained the added allegation and defense that "defendant alleges the fact to be that the damage and injury suffered by the plaintiffs

herein were occasioned and caused by an unusual and unprecedented storm and flood which occurred in the city of Dickinson and vicinity on or about the 28th day of July, 1914, and said damage was not in any manner caused through any negligence on the part of the defendant railway company." A verdict was rendered in favor of the plaintiff for the sum of $2,500, and from the judgment entered therein this appeal has been taken.

Plat of part of the city of Dickinson, showing area flooded July 28, 1914.

Figures in corners of blocks denote grade elevation at that point, also height of sidewalk above datum.
Elevation at high-water mark is 96.8 feet above datum.
Dotted line shows approximate high-water line and includes the area flooded.

*Watson & Young* and *E. T. Conmy,* for appellant.

The evidence shows that if any waters were obstructed by this defendant and thrown back on the property of plaintiffs, they were mere storm or surface waters, and the defendant cannot be held liable for any damage so caused. 30 Am. & Eng. Enc. Law, 330; Walker v. New Mexico & S. P. R. Co. 165 U. S. 593, 41 L. ed. 837, 17 Sup. Ct. Rep. 421, 1 Am. Neg. Rep. 768; Hagge v. Kansas City Southern R. Co. 104

Fed. 391; Chadeayne v. Robinson, 55 Conn. 345, 3 Am. St. Rep. 55, 11 Atl. 592; Taylor v. Fickas, 64 Ind. 167, 31 Am. Rep. 114; Gannon v. Hargadon, 10 Allen, 106, 87 Am. Dec. 625; Morrissey v. Chicago, B. & Q. R. Co. 38 Neb. 406, 56 N. W. 946, 57 N. W. 522; Swett v. Cutts, 50 N. H. 439, 9 Am. Rep. 276; Bowlsby v. Speer, 31 N. J. L. 351, 86 Am. Dec. 216; Barkley v. Wilcox, 86 N. Y. 140, 40 Am. Rep. 519; Edwards v. Charlotte, C. & A. R. Co. 39 S. C. 472, 22 L.R.A. 246, 39 Am. St. Rep. 746, 18 S. E. 58; Cass v. Dicks, 14 Wash. 75, 53 Am. St. Rep. 859, 44 Pac. 113.

In jurisdictions where the common-law rule obtains, it is applicable to the obstruction of the flow of surface waters in the construction of railroads. 30 Am. & Eng. Enc. Law, 332; Walker v. New Mexico & S. P. R. Co. 165 U. S. 593, 41 L. ed. 837, 17 Sup. Ct. Rep. 421, 1 Am. Neg. Rep. 768; Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 1, 37 N. W. 717; Atchison, T. & S. F. R. Co. v. Hammer, 22 Kan. 763, 31 Am. Rep. 216; Brown v. Winona & S. W. R. Co. 53 Minn. 259, 39 Am. St. Rep. 603, 55 N. W. 123; Morrissey v. Chicago, B. & Q. R. Co. 38 Neb. 406, 56 N. W. 946, 57 N. W. 522; Baltzeger v. Carolina Midland R. Co. 54 S. C. 242, 71 Am. St. Rep. 789, 32 S. E. 358; O'Connor v. Fond du Lac, A. & P. R. Co. 52 Wis. 526, 38 Am. Rep. 753, 9 N. W. 287.

Under the civil-law rule as to surface waters, the lower landowner is bound to receive the waters which flow from the land above, and cannot cast it back upon his neighbor to his damages. 30 Am. & Eng. Enc. Law, 326, 329; Livingston v. McDonald, 21 Iowa, 160, 89 Am. Dec. 563; Wharton v. Stevens, 84 Iowa, 107, 15 L.R.A. 630, 35 Am. St. Rep. 296, 50 N. W. 562.

The common-law rule seems to have been adopted in this state. Gibbs v. Williams, 25 Kan. 214, 37 Am. Rep. 241; Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 1, 37 N. W. 717; Missouri P. R. Co. v. Renfro, 52 Kan. 237, 39 Am. St. Rep. 344, 34 Pac. 802; Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894; Albers v. Chicago, B. & Q. R. Co. 95 Neb. 506, 145 N. W. 1013.

Sloughs and ravines, through which waters collected from surrounding territory pass in times of freshets from rains and melting snow, but which at other times are dry, are not to be considered water courses. 30 Am. & Eng. Enc. Law, pp. 350, 351; Swett v. Cutts, 50 N. H. 439, 9 Am. Rep. 276; Ashley v. Wolcott, 11 Cush. 192; Hoyt v. Hudson, 27

Wis. 656, 9 Am. Rep. 473, 41 Wis. 105, 22 Am. Rep. 714; Angell, Watercourses, 5th ed., § 4; Barnes v. Sabron, 10 Nev. 218, 4 Mor. Min. Rep. 673; Howard v. Ingersoll, 13 How. 427, 14 L. ed. 209; Gibbs v. Williams, 25 Kan. 214, 37 Am. Rep. 241; Weis v. Madison, 75 Ind. 241, 39 Am. Rep. 135; Barkley v. Wilcox, 86 N. Y. 140, 40 Am. Rep. 519.

There is no evidence to show that the damage which plaintiffs suffered was caused by the negligence of defendant, or that any act of defendant was the proximate cause of the injury. The defendant's only duty was to build a culvert in the ordinary and usual manner sufficient to take care of the ordinary storm waters which might accumulate or pass through it, through the hollow or ravine or drainage channel. Hughes v. Anderson, 68 Ala. 280, 44 Am. Rep. 147; Nininger v. Norwood, 72 Ala. 277, 47 Am. Rep. 412; Savannah, A. & M. R. Co. v. Buford, 106 Ala. 303, 17 So. 395; Alabama G. S. R. Co. v. Shahan, 116 Ala. 302, 22 So. 509, 115 Ala. 181, 67 Am. St. Rep. 20, 22 So. 449; Southern R. Co. v. Plott, 131 Ala. 312, 31 So. 33; Ohio & M. R. Co. v. Wachter, 123 Ill. 440, 5 Am. St. Rep. 532, 15 N. E. 279; Philadelphia, W. & B. R. Co. v. Davis, 68 Md. 281, 6 Am. St. Rep. 440, 11 Atl. 822; Sullens v. Chicago, R. I. & P. R. Co. 74 Iowa, 659, 7 Am. St. Rep. 501, 38 N. W. 545; Harrison v. Great Northern R. Co. 3 Hurlst. & C. 236, 33 L. J. Exch. N. S. 266, 10 Jur. N. S. 992, 10 L. T. N. S. 621, 12 Week. Rep. 1081, 25 Eng. Rul. Cas. 411; Central of Georgia R. Co. v. Keyton, 148 Ala. 675, 41 So. 918; Matteson v. New York C. & H. R. R. Co. 40 Pa. Super. Ct. 234; Pittsburg, Ft. W. & C. R. Co. v. Gilleland, 56 Pa. 445, 94 Am. Dec. 98; American Locomotive Co. v. Hoffman, 105 Va. 343, 6 L.R.A.(N.S.) 252, 54 S. E. 25, 8 Ann. Cas. 773; Illinois C. R. Co. v. Bethel, 11 Ill. App. 17; Dorman v. Ames, 12 Minn. 451, Gil. 347; Ohio & M. R. Co. v. Thillman, 143 Ill. 127, 36 Am. St. Rep. 359, 32 N. E. 529; Brown v. Chicago, B. & Q. R. Co. 195 Fed. 1007; State ex rel. Trimble v. Minneapolis, St. P. & S. M. R. Co. 28 N. D. 621, 150 N. W. 463; Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894; Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 24, 37 N. W. 717.

The burden of proving negligence in a tort action is on him who asserts it, and such rule has full application here. Cameron v. Great Northern R. Co. 8 N. D. 124, 77 N. W. 1016, 5 Am. Neg. Rep. 454; Whitney v. Clifford, 57 Wis. 156, 14 N. W. 927; Shearm. & Redf. Neg.

§§ 57, 58; Nason v. West, 78 Me. 253, 3 Atl. 911, 15 Am. Neg. Cas. 273; Meehan v. Great Northern R. Co. 13 N. D. 443, 101 N. W. 183; Fredericks v. Pennsylvania R. Co. 225 Pa. 23, 73 Atl. 965; Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 19 L. ed. 909; Treichel v. Great Northern R. Co. 80 Minn. 96, 82 N. W. 1110; Brown v. Chicago, B. & Q. R. Co. 195 Fed. 1007; Berninger v. Sunbury, H. & W. R. Co. 203 Pa. 516, 53 Atl. 361.

The acts charged here are not shown to have been the proximate cause of the injury. Karchner v. Pennsylvania R. Co. 218 Pa. 309, 67 Atl. 644; Oakley Mills Mfg. Co. v. Neese, 54 Ga. 459; Texas & P. R. Co. v. Padgett, 14 Tex. Civ. App. 435, 37 S. W. 92; Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 27 L.R.A. 762, 48 Am. St. Rep. 579, 17 So. 78; Brown v. Chicago, B. & Q. R. Co. 195 Fed. 1012; Sheldon v. Hudson R. R. Co. 29 Barb. 228; Longabaugh v. Virginia City & T. R. Co. 9 Nev. 296; Smith v. Hannibal & St. J. R. Co. 37 Mo. 295; Omaha & R. Valley R. Co. v. Clark, 35 Neb. 867, 23 L.R.A. 509, 53 N. W. 970; Kilpatrick v. Richardson, 37 Neb. 731, 56 N. W. 481; White v. Chicago, M. & St. P. R. Co. 1 S. D. 330, 9 L.R.A. 824, 47 N. W. 146; Balding v. Andrews, 12 N. D. 277, 93 N. W. 305, 14 Am. Neg. Rep. 615; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A. (N.S.) 520, 122 N. W. 1000; Andrews v. Kinsel, 114 Ga. 390, 88 Am. St. Rep. 25, 40 S. E. 300; 8 Am. & Eng. Enc. Law 2d ed. 580.

A negligent act, which would not have resulted in injury except for the intervention of an independent cause, does not give rise to a cause of action. Schwartz v. California Gas & Electric Corp. 163 Cal. 398, 125 Pac. 1044; Baltimore & O. R. Co. v. Simpson, 31 Ohio C. C. 349; Coleman v. Kansas City, St. J. & C. B. R. Co. 36 Mo. App. 476; Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390; Meehan v. Great Northern R. Co. 13 N. D. 443, 101 N. W. 183; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000.

The lower property owner does not have to make provision to care for the waters of an extraordinary and unusual flood or storm. He is only required to provide a way or culvert sufficient to take care of the waters of the ordinary rain and snow. Such is the American doctrine. China v. Southwick, 12 Me. 238; Bell v. M'Clintock, 9 Watts, 119, 34 Am. Dec. 507; Lehigh Bridge Co. v. Lehigh Coal & Nav. Co. 4 Rawle, 9, 26 Am. Dec. 111; Everett v. Hydraulic Flume Tunnel Co. 23 Cal. 225,

4 Mor. Min. Rep. 589; Hoffman v. Tuolumne County Water Co. 10 Cal. 413; Wolf v. St. Louis Independent Water Co. 10 Cal. 541, 10 Mor. Min. Rep. 636; Lapham v. Curtis, 5 Vt. 371, 26 Am. Dec. 310; Higgins v. Chesapeake & D. Canal Co. 3 Harr. (Del.) 411; Morris Canal & Bkg. Co. v. Ryerson, 27 N. J. L. 457; Tenney v. Miner's Ditch Co. 7 Cal. 335, 11 Mor. Min. Rep. 31; Richardson v. Kier, 34 Cal. 63, 91 Am. Dec. 681, 4 Mor. Min. Rep. 612; Shrewsbury v. Smith, 12 Cush. 177; Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 23, 37 N. W. 717; 1 Thomp. Neg. 2d ed. § 72; Pittsburg, Ft. W. & C. R. Co. v. Gilleland, 56 Pa. 445, 94 Am. Dec. 98; Chicago, R. I. & P. R. Co. v. Buel, 76 Neb. 420, 107 N. W. 590; Southern R. Co. v. Plott, 131 Ala. 312, 31 So. 33; Baltimore & O. R. Co. v. Sulphur Spring Independent School Dist. 96 Pa. 65, 42 Am. Rep. 529; Price v. Oregon R. & Nav. Co. 47 Or. 350, 83 Pac. 843; Nashville & C. R. Co. v. David, 6 Heisk. 261, 19 Am. Rep. 594; American Locomotive Co. v. Hoffman, 105 Va. 343, 6 L.R.A.(N.S.) 252, 54 S. E. 25, 8 Ann. Cas. 773; Brown v. Chicago, B. & Q. R. Co. 195 Fed. 1007; Egan v. Central Vermont R. Co. 81 Vt. 141, 16 L.R.A.(N.S.) 928, 130 Am. St. Rep. 1031, 69 Atl. 732.

This rule is liberally construed and applied in case of railroads,— they not being held so strictly liable, because of the necessary construction of culverts and embankments, unless it is shown that they are improperly constructed. Pittsburg, Ft. W. & C. R. Co. v. Gilleland, 56 Pa. 445, 94 Am. Dec. 98; Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 24, 37 N. W. 717; Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894.

Especially is this true where the flood is caused by an unprecedented storm or downpour of rain, such a storm or condition as could not have been anticipated, or reasonably provided against. Greiner v. Alfred Struck Co. 161 Ky. 793, 171 S. W. 405; Palmyra v. Waverly Woolen Co. 102 Me. 317, 66 Atl. 646; Grand Valley Irrig. Co. v. Pitzer, 14 Colo. App. 123, 59 Pac. 420; Albers v. Chicago, B. & Q. R. Co. 95 Neb. 506, 145 N. W. 1013; Century Dig. "Waters & Water Courses," § 250; Decennial Dig. "Waters & Water Courses," § 179; Peterson v. Chicago, M. & St. P. R. Co. 19 S. D. 122, 102 N. W. 595; Egan v. Central Vermont R. Co. 81 Vt. 141, 16 L.R.A.(N.S.) 928, 130 Am. St. Rep. 1031, 69 Atl. 732; Pittsburg, Ft. W. & C. R. Co. v. Gille-

land, supra; Ohio & M. R. Co. v. Thillman, 143 Ill. 127, 36 Am. St. Rep. 359, 32 N. E. 529; Kansas City, P. & G. R. Co. v. Williams, 3 Ind. Terr. 352, 58 S. W. 570; Mulligan v. Pennsylvania R. Co. 225 Pa. 76, 73 Atl. 1058; Baltimore & O. R. Co. v. Sulphur Spring Independent School Dist. 96 Pa. 65, 42 Am. Rep. 529; Vyse v. Chicago, B. & Q. R. Co. 126 Iowa, 90, 101 N. W. 736; Bristol Hydraulic Co. v. Boyer, 67 Ind. 236; Siegfried v. South Bethlehem, 27 Pa. Super. Ct. 456; Taylor v. Canton Twp. 30 Pa. Super. Ct. 305; Lyon v. Chicago, M. & St. P. R. Co. 45 Mont. 33, 121 Pac. 886; Karchner v. Pennsylvania R. Co. 218 Pa. 309, 67 Atl. 644; Ætna Mill & Elevator Co. v. Atchison, T. & S. F. R. Co. 89 Kan. 38, 130 Pac. 686; Brown v. Chicago, B. & Q. R. Co. 195 Fed. 1007; Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 189, 190, 19 L. ed. 909, 912, 913; Harris v. Lincoln & N. W. R. Co. 91 Neb. 755, 137 N. W. 865; Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 27 L.R.A. 762, 48 Am. St. Rep. 579, 17 So. 78; Texas & P. R. Co. v. Padgett, 14 Tex. Cic. App. 435, 37 S. W. 92; Fuller v. Northern P. Elevator Co. 2 N. D. 220, 50 N. W. 359; Duncan v. Great Northern R. Co. 17 N. D. 610, 19 L.R.A.(N.S.) 952, 118 N. W. 826; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Bowman v. Eppinger, 1 N. D. 25, 44 N. W. 1000; Finney v. Northern P. R. Co. 3 Dak. 270, 16 N. W. 500; Pirie v. Gillitt, 2 N. D. 255, 50 N. W. 710; Richmire v. Andrews & G. Elevator Co. 11 N. D. 453, 92 N. W. 819; McMillen v. Aitchison, 3 N. D. 183, 54 N. W. 1030; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615; Elliott v. Chicago, M. & St. P. R. Co. 150 U. S. 245, 37 L. ed. 1068, 14 Sup. Ct. Rep. 85; Reynolds v. Great Northern R. Co. 29 L.R.A. 695, 16 C. C. A. 435, 32 U. S. App. 577, 69 Fed. 808.

Opinion evidence is worthless when inconsistent with clearly proved facts or with reason and common sense as applied to other credible evidence. 2 Moore, Facts, § 1236; Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 27 L.R.A. 762, 48 Am. St. Rep. 579, 17 So. 78.

Where there is an established rule of law as to the measure of damages in a particular class of cases, the court should inform the jury as to such rule, and a failure to do so is ground for a new trial. This is true even though no request was made. 2 Thomp. Trials, § 2188; Citizens' Street R. Co. v. Burke, 98 Tenn. 650, 40 S. W. 1085, 2 Am. Neg. Rep. 459; Houston & T. C. R. Co. v. Buchanan, 38 Tex.

Civ. App. 165, 84 S. W. 1073; Central of Georgia R. Co. v. Hughes, 127 Ga. 593, 56 S. E. 770; Western Maryland R. Co. v. Martin, 110 Md. 554, 73 Atl. 267; Jageriskey v. Detroit United R. Co. 163 Mich. 631, 128 N. W. 726; Burns v. Pennsylvania R. Co. 233 Pa. 304, 82 Atl. 246, Ann. Cas. 1913B, 811; Otis Elevator Co. v. Flanders Realty Co. 244 Pa. 186, 90 Atl. 624; Baltimore & O. R. Co. v. Carr, 71 Md. 135, 17 Atl. 1052; Wilkinson v. North East, 215 Pa. 486, 64 Atl. 734; Quanah, A. & P. R. Co. v. Galloway, — Tex. Civ. App. —, 154 S. W. 53; Himes v. Kiehl, 154 Pa. 190, 25 Atl. 632; Kansas City, M. & O. R. Co. v. Worsham, — Tex. Civ. App. —, 149 S. W. 755; Hazlewood v. Pennybacker, — Tex. Civ. App. —, 50 S. W. 199; Moore v. Booker, 4 N. D. 543, 62 N. W. 607; McPherrin v. Jones, 5 N. D. 261, 65 N. W. 685.

A witness to testify as to value of damaged hardware, as in this case, must be competent. He must show his knowledge, experience, and training along the line his testimony would cover. His testimony is sought and given as expert testimony. 17 Cyc. 109, 112; Tetrault v. O'Connor, 8 N. D. 15, 76 N. W. 225; Minneapolis Threshing Mach. Co. v. McDonald, 10 N. D. 408, 87 N. W. 993; Raymond v. Edelbrock, 15 N. D. 231, 107 N. W. 194.

Questions by counsel should not be permitted where the clear purpose is merely to create prejudice against a party. Tijerina v. State, 45 Tex. Crim. Rep. 182, 74 S. W. 913; Davy v. Great Northern R. Co. 21 N. D. 43, 128 N. W. 311.

The trial court should instruct fully on the law of the case, whether requested to do so or not. It is a duty to be performed. Moline Plow Co. v. Gilbert, 3 Dak. 239, 15 N. W. 1; Owen v. Owen, 22 Iowa, 270; Forzen v. Hurd, 20 N. D. 43, 126 N. W. 224; Barton v. Gray, 57 Mich. 622, 24 N. W. 638; Putnam v. Prouty, 24 N. D. 531, 140 N. W. 93.

*T. F. Murtha, Thomas Pugh,* and *J. W. Sturgeon,* for respondent.

Where the waters from melting snows and rains have worn out for themselves a natural channel through which they drain in a visible stream, such natural channel may not be blocked or obstructed. Bischmann v. Boehl, 30 Ill. App. 455; Chicago, R. I. & P. R. Co. v. Carey, 90 Ill. 514; 3 Farnham, Waters, p. 2589.

The rule is that natural drains must be kept open to carry the water

into the streams, and that the lower estate is subject to natural servitude for that purpose. Albany v. Sikes, 94 Ga. 30, 26 L.R.A. 653, 47 Am. St. Rep. 132, 20 S. E. 257; Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 22 L.R.A.(N.S.) 789, 120 N. W. 884; Chicago, R. I. & P. R. Co. v. Groves, 20 Okla. 101, 22 L.R.A.(N.S.) 802, 93 Pac. 755; Jungblum v. Minneapolis, N. U. & S. W. R. Co. 70 Minn. 153, 72 N. W. 971.

It is the duty of a railroad company to construct its culverts in such a manner as will not obstruct or block the natural flow of waters through natural channels or drains, or be cast back on the property of higher landowners. Blunck v. Chicago & N. W. R. Co. — Iowa, —, 115 N. W. 1013; Fremont, E. & M. Valley R. Co. v. Harlin, 50 Neb. 698, 36 L.R.A. 417, 61 Am. St. Rep. 578, 70 N. W. 263, 1 Am. Neg. Rep. 312; Ogburn v. Connor, 46 Cal. 347, 13 Am. Rep. 213; 3 Farnham, Waters, pp. 2334–2709; Chicago, R. I. & P. R. Co. v. Shaw, 63 Neb. 380, 56 L.R.A. 341, 88 N. W. 508; Tretter v. Chicago G. W. R. Co. 147 Iowa, 375, 140 Am. St. Rep. 304, 126 N. W. 339; Jungblym v. Minneapolis, N. U. & S. W. R. Co. 70 Minn. 153, 72 N. W. 971; Sanguinetti v. Polk, 136 Cal. 466, 89 Am. St. Rep. 169, 69 Pac. 98; Launstein v. Launstein, 150 Mich. 524, 121 Am. St. Rep. 635, 114 N. W. 383; Pinkstaff v. Steffy, 216 Ill. 406, 75 N. E. 163 (1905); Fordham v. Northern P. R. Co. 30 Mont. 421, 66 L.R.A. 556, 104 Am. St. Rep. 729, 76 Pac. 1040; Chicago, R. I. & P. R. Co. v. Lynch, 163 Iowa, 283, 143 N. W. 1083; Feldkamp v. Ernst, 177 Mich. 550, 143 N. W. 887; Iske v. Missouri P. R. Co. 94 Neb. 9, 142 N. W. 671; Johnson v. Marcum, 152 Ky. 629, 153 S. W. 959; Thompson v. Mobile, J. & K. C. R. Co. 104 Miss. 651, 61 So. 596; Tranbarger v. Chicago & A. R. Co. 250 Mo. 46, 156 S. W. 694; Anheuser-Busch Brewing Asso. v. Peterson, 41 Neb. 897, 60 N. W. 373; Roe v. Howard County, 75 Neb. 448, 5 L.R.A.(N.S.) 831, 106 N. W. 587; Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811; Parizek v. Hinek, 144 Iowa, 563, 123 N. W. 180; Alabama G. S. R. Co. v. Prouty, 149 Ala. 71, 43 So. 352; Gillham v. Madison County R. Co. 49 Ill. 484, 95 Am. Dec. 627; Foley v. Godchaux, 48 La. Ann. 466, 19 So. 247; Willis v. White, 150 N. C. 199, 134 Am. St. Rep. 906, 63 S. E. 942; Blue v. Wentz, 54 Ohio St. 247, 43 N. E. 493; Glass v. Fritz, 148 Pa. 324, 23 Atl. 1050; Lawton v. South Bound R. Co. 61 S. C. 548, 39

S. E. 752; Shane v. Kansas City, St. J. & C. B. R. Co. 71 Mo. 238, 36 Am. Rep. 480; Texas Trunk R. Co. v. Elam, 1 Tex. App. Civ. Cas. (White & W.) 201; 40 Cyc. 639–643; Boyd v. Conklin, 54 Mich. 583, 52 Am. Rep. 831, 20 N. W. 595; Barstow Irrig. Co. v. Black, 39 Tex. Civ. App. 80, 86 S. W. 1036; Shaw v. Sebastopol, 159 Cal. 623, 115 Pac. 213; Flesner v. Steinbruck, 89 Neb. 129, 34 L.R.A.(N.S.) 1055, 130 N. W. 1040; Trenton v. Rucker, 162 Mich. 19, 34 L.R.A. (N.S.) 569, 127 N. W. 39; Kelly v. Kansas City Southern R. Co. 92 Ark. 465, 123 S. W. 664; Jonesboro, L. C. & E. R. Co. v. Cable, 89 Ark. 518, 117 S. W. 550; McGehee v. Tidewater R. Co. 108 Va. 508, 62 S. E. 356; Perrine v. Pennsylvania R. Co. 71 N. J. L. 644, 62 Atl. 702.

There is no right resting in a lower landowner to dam back water which is flowing in a definite channel. The defendant here has so used its property as to unnecessarily injure its neighbor, and should respond in damages. Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 22 L.R.A.(N.S.) 789, 120 N. W. 884; Chicago, R. I. & P. R. Co. v. Groves, 20 Okla. 101, 22 L.R.A.(N.S.) 802, 93 Pac. 755.

It is a sufficient showing of negligence, when plaintiffs prove conclusively that defendant's culverts failed repeatedly and on different occasions to carry off, or allow matters to flow through and not back up. Such is a sufficient showing that the culverts are not proper or adequate for the purpose necessary. Blunck v. Chicago & N. W. R. Co. — Iowa, —, 115 N. W. 1013, ¶ 3 of syllabus; Fremont, E. & M. Valley R. Co. v. Harlin, 50 Neb. 698, 36 L.R.A. 417, 61 Am. St. Rep. 578, 70 N. W. 263; Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811, ¶ 4 of syllabus.

The question of an act of God is a matter of affirmative defense, and must be established by defendant that it could not, by ordinary care, have guarded against such act or occurrence. Missouri P. R. Co. v. Hemingway, 63 Neb. 610, 88 N. W. 673; 2 Sackett, Instructions to Juries, p. 1523, § 2362.

It is a question of fact for the jury to decide whether or not the storm was of such unprecedented character that defendant could not have anticipated and guarded against resultant damages. Wilson v. Boise City, 20 Idaho, 133, 36 L.R.A.(N.S.) 1158, 117 Pac. 115, 1 N. C. C. A. 203; Blunck v. Chicago & N. W. R. Co. supra; Chicago, R. I. & P. R. Co. v. Shaw, 63 Neb. 380, 56 L.R.A. 341, 88 N. W. 508; Gray v.

Harris, 107 Mass. 492, 9 Am. Rep. 61; Fairbury Brick Co. v. Chicago, R. I. & P. R. Co. 79 Neb. 854, 13 L.R.A.(N.S.) 542, 113 N. W. 535.

No more definite instructions were requested by defendant than were given by the court. Dissatisfaction on the part of the defendant should have led it to make requests of the court. Houghtaling v. Chicago G. W. R. Co. supra; Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 22 L.R.A.(N.S.) 789, 120 N. W. 884, ¶ 3 of the syllabus; Fordham v. Northern P. R. Co. 30 Mont. 421, 66 L.R.A. 556, 104 Am. St. Rep. 729, 76 Pac. 1040.

BRUCE, J. (after stating the facts as above). It is not, we believe, contended in this case that the flooding of the plaintiffs' premises in question was occasioned by the obstruction of a flowing stream, but rather by the obstruction of a natural water course which served as a natural drainage for surface and storm waters, and which on the occasion in question was flooded by a heavy rain storm which occurred on the night of July 28, 1914, and in the early morning of July 29, 1914.

"Under the common-law rule which exists in many jurisdictions, surface water is regarded as a common enemy, and every landed proprietor has the right, as a general proposition, to take any measures necessary to the protection of his property from its ravages, even if in doing so he prevents its entrance upon his land and throws it back upon a coterminous proprietor. The damage resulting in such case is regarded as *damnum absque injuria*, affording no cause of action." See 30 Am. & Eng. Enc. Law, 2d ed. 330; Walker v. New Mexico & S. P. R. Co. 165 U. S. 593, 41 L. ed. 837, 17 Sup. Ct. Rep. 421, 1 Am. Neg. Rep. 421.

"Under the rule of the civil law . . . the right to drain surface waters is governed by the law of nature, as between the owners of adjacent lands, and the lower proprietor is bound to receive the surface waters which naturally flow from the land above, and cannot do anything to prevent such flow which will cast it back upon the land above." 30 Am. & Eng. Enc. Law, 2d ed. 326; Shahan v. Alabama G. S. R. Co. 115 Ala. 181, 67 Am. St. Rep. 20, 22 So. 449; Gillham v. Madison County R. Co. 49 Ill. 484, 93 Am. Dec. 627; Alton & U. A. Horse & Carrying R. Co. v. Deitz, 50 Ill. 210, 99 Am. Dec. 509; see also discussions in Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 1, 37 N. W. 717, and Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894.

In North Dakota we have not as yet committed ourselves to either rule, as a choice has not as yet been necessary in any of the cases argued, and the court has naturally hesitated in foreclosing a question whose determination should depend upon considerations of public expediency and necessity, and be considered in the light of the peculiar topography and climatic conditions of the state, and to whose wise solutions every days brings more light and the results of a larger body of accumulated experience. The question, though, has been incidentally presented and discussed. See Hannaher v. St. Paul, M. & M. R. Co. and Carroll v. Rye Twp. supra.

Nor is it necessary to adopt either rule in the case which is before us, as we are convinced that there is in the record and that there was properly submitted to the jury, evidence which tends to show that the swale, depression, or whatever it may have been in the case before us, was a "natural drain way." If it was a natural drain way, it is immaterial whether the so-called common enemy or the civil-law rule as to surface waters prevails in North Dakota, as both "under the civil law and the English common . . . [enemy theories] the rule is that the natural drain ways must be kept open to carry the water into the streams, and that the lower estate is subject to a natural servitude for that purpose." 3 Farnham, Waters, p. 2555.

The building of the plaintiffs faced south on Villard street. Villard street runs east and west and a block or so north of and parallel to the railroad tracks. There is evidence in the record tending to show that the ditch or ravine which runs from Villard street to the railroad track, and which empties through the culvert of the railway company and underneath its tracks, had been in existence for some thirty years, and, although only extending a short distance north of Villard street and some three or four blocks north of the railroad track, served as a natural runway or drainage for a larger natural drainage basin of some 160 acres which extended to the northeast. There is also evidence which tends to show that this ditch has now, and for a long time prior to the flood in controversy had, a well-defined channel, and that though grass grew at its sides, that grass had at its bottom been worn away to a breadth of 3 or 4 feet by the running waters. It is true that there is no evidence or pretense that the water ran in this ditch all of the time or even usually ran in this ditch, but there is evidence that it ran therein whenever there

were heavy rains and when the snow melted in the spring. Such being the case, it is clear that the ditch or ravine, though not a stream, was nevertheless a natural drain way which drained a more or less extended area of land or drainage basin into the Heart river. It is clear, also, that though the railway company had the right to build an embankment across it, it nevertheless owed the duty to the landowners in the drainage basin to do so in such a manner that the water which could be reasonably anticipated to flow therein and to be drained thereby could be as well accommodated as before the construction of its improvements. This is true under both the civil law and the so-called common-enemy theory of surface waters. See Farnham, Waters, p. 2555. "In all broken country," says this author (page 2571), "there are gullies, ravines, or swales which in many cases, when the land was covered with woods, formed the beds of flowing streams which gradually dried up as the woods were cleared away, but which are natural drains in which water runs in every time of heavy rain. In case one of these drains is stopped, the natural result is to pond the water above the point of stoppage, and compel it to find another outlet, or to stand until it is absorbed or evaporates. This is a distinct injury to the upper owner without any corresponding benefit to the lower one, and it should not be permitted to be done." This is undoubtedly the prevailing rule in America, and is both the civil-law and the common-enemy rule, though not a few writers and courts have confused the terms "common enemy" with the term "common law," and have imagined that what is termed "the common-enemy theory," and which relates merely to what are, strictly speaking, surface waters and waters which do not flow in defined channels, applied at the common law generally to all non-navigable waters.

The reason for what may be termed the prevailing American rule, and which we here adopt in North Dakota, is well stated by Mr. Farnham on page 2599 of his excellent work on "Waters and Water Rights." "The question of the right to obstruct a natural drainage channel," he says, "has been needlessly complicated with the further question whether or not a water course existed. The rules with respect to water courses form a distinct class by themselves, and were formulated to conserve the interests of the riparian owners. On the other hand, the question of drainage involves not only the welfare of the individual landowner, but also that of the community in so far as its healthfulness and prosperity

depend upon relieving land of stagnant water and improving its pro-
ductiveness.   Before man owned any parcel of land, nature had im-
pressed upon it certain characteristics.   So far as these can be changed
without interfering with the use or enjoyment of neighboring prop-
erty, they may be changed at will.   But, so far as one parcel has been
subjected by nature to a servitude in favor of an adjoining parcel, the
enjoyment of which will be materially injured by destroying the servi-
tude, it would seem that the rule by which a purchaser of property is
bound by its condition when he acquires title would prevent the destruc-
tion of such servitude.   In order to be within the operation of this rule,
. . . the great weight of authority is in favor of the proposition that
a lower proprietor cannot place any obstruction in an obvious drainage
channel which has been formed by nature and carries the water from a
higher to a lower estate.   Some courts have reached the same result by
holding that channels formed by surface water might be water courses,
and have applied to them the rule governing the obstruction of such
courses, and in some cases there is no doubt that channels which now .
carry merely surface water were once living streams.   When the country
was covered with forest so that the ground was more nearly saturated
with water, springs came to the surface and fed streams which flowed
more or less constantly down these channels, but, as the land was
cleared and brought under cultivation, the springs gradually lost their
strength and finally disappeared, so that the channels which formerly
carried the streams flowing from them now receive only the water
which comes from surface drainage.   But there is no reason why, if the
rule of water courses rather than that of drainage is to be applied, it
should not be applied to this class of channels.   That these drainage
channels cannot be obstructed is supported by the great weight of au-
thority.   It is the rule in England, Canada, Ireland, Alabama, Cali-
fornia, Delaware, Georgia, Illinois, Iowa, Kentucky, Louisiana, Mary-
land, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey,
North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Vir-
ginia, Vermont, and West Virginia.   And in Arkansas no obstruction
to the flow of surface water is permissible if it can be avoided by rea-
sonable care and expense.   To reach their conclusions, some of the courts
above named have attempted to show that the channels in which the
water was running were water courses, but they were not water courses

within the rule governing riparian rights; and the attempt to demonstrate the existence of a water course was made necessary by the disastrous effects which would attend the opposite holding. In fact, when surface water has united to form a stream the effect of damming it back is temporarily as bad as the damming back of a water course, and similarity in the effect absolutely demands the application of the same rule to each. And, in order to do so, the courts which have not perceived the full meaning of the civil-law rule as to drainage have attempted the makeshift of bringing the particular stream within the rule governing the stoppage of water courses by showing that they were in fact such, whereas the only similarity was in the result of stopping a present flow. Practically all of the courts admit that there may be a flow of surface water of such magnitude that it cannot be stopped; but natural drainage channels are allowed to be closed by the Supreme Court of the United States when the question comes before it as a common-law question; and by the courts of Indiana, Kansas, Maine, Massachusetts, Missouri, New York, South Carolina, and Washington. The Kansas court has intimated that, if the channel approaches the nature of a water course, there is no right to dam it up. And in Missouri a statute has been passed giving the right to cast water into natural depressions which act as drains. Of the other courts above referred to, the Supreme Court of the United States and the courts of South Carolina and Washington placed their rulings expressly upon the ground that the common law had been adopted by statute, and that therefore there was a right to dam back the water. But, it having been demonstrated in a preceding section that by the common law there is no right to dam back the water which is flowing in a definite channel, those decisions are based upon a misconception and should have been the other way. Some courts have not yet expressed themselves upon this question, and some appear to be in a class by themselves, so that they are not properly included in either list. Among these is the Wisconsin court. The rule which obtains in that state, as well as the course of a decision in Minnesota, is treated in a separate section. This conflict in opinion arises in most cases out of a failure to understand the civil-law rule, and in attempting to determine drainage rights by the rules applicable to water courses. As has been seen, the civil-law rule is merely that when the water has its course regulated from one ground to another,—that is, when it has taken a

definite course in a definite channel,—it cannot be stopped up. Practically all the courts, except the Supreme Court of the United States and the courts of Indiana, New York, Missouri, Wisconsin, and the lower courts of New Jersey, agree in this rule, but, in applying it, they differ somewhat in their conclusions, the difference depending largely upon how far each court has embraced the idea that a water course must, in fact, exist before the rule can be applied. As will be seen in the succeeding sections, there is no right anywhere to the continued flow of water which has not taken a definite course, but which spreads out over the surface of the ground. And, if the courts would recognize the fact that the right to the flow of the water which has taken a definite course is a rule of drainage, and not of water courses, most of the difficulty which they have experienced would disappear. The rule of drainage applies if the water has taken a definite course, although the flow is not strong enough to cut the sod or form a trench in the soil, it is enough that a natural depression forms a channel for the stream." See also Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 120 N. W. 884, and note thereto in 22 L.R.A.(N.S.) 789; Chicago, R. I. & P. R. Co. v. Groves, 20 Okla. 101, 22 L.R.A.(N.S.) 802, 93 Pac. 755.

Again, in Jungblum v. Minneapolis, N. U. & S. W. R. Co. 70 Minn. 153, 72 N. W. 971, which seemingly overruled the prior decisions of that tribunal, the supreme court of Minnesota said: "There was evidence given on the trial on behalf of the plaintiff tending to show that this depression was the usual and natural course or channel along which the surface water was accustomed to flow, before the roadbed was constructed, for a mile or two east of the roadbed, and that the channel bears marks of water having flowed through it. Whether this depression is a natural water course, within the strict definition of the term, we need not determine; for the evidence justifies a finding that it was the usual and natural channel for surface water, and offered a reasonable way for the defendant by the construction of a culvert to dispose of the surface water without injury to any landowner. The trial court submitted this question to the jury in these words: 'If the jury finds from the evidence that the defendant might reasonably have constructed a culvert through its roadbed, and thereby have conveyed the water in question through its natural and usual channel from its right of way, without injury to any other landowner, and that it neglected to do so,

but that it unnecessarily or unreasonably drained the water upon the plaintiff's land, to the plaintiff's injury, then the plaintiff is entitled to recover.' "

Being, then, a natural drain way, it was the duty of the defendant railway company to accommodate itself to and to provide for the undisturbed passage through it of all of the water which was or might be reasonably anticipated to drain therein; and this duty was a continuing duty. See State ex rel. Trimble v. Minneapolis, St. P. & S. Ste. M. R. Co. 28 N. D. 621, 150 N. W. 463. The question to be determined is whether there is competent evidence in the record, and which was properly submitted to the jury, which tended to show that this duty had not been complied with, and that the damage to the plaintiffs' and respondents' property was occasioned by this noncompliance, or whether, as contended by defendant and appellant, the uncontradicted evidence showed that the culvert was in every way adequate for all flowage that could or should have been anticipated, and that the flooding of plaintiffs' premises was either occasioned by an extraordinary downpour or cloudburst which it was not the duty of the defendant to anticipate, or by the blocking of the channel by a floating sidewalk or some other obstruction which it was not the duty of the defendant to guard against or to anticipate. We are satisfied that there was such evidence, and the trouble with defendant's defense is that, it once being established that the flooding of plaintiffs' premises was occasioned by the inability of the culvert to carry off the water, and of this we hardly think defendant will contend that there is not at least some evidence, the burden is upon it, and not on the plaintiff, to show that the storm was so unusual and extraordinary that it need not have been anticipated.

Even if we admit that the evidence of plaintiffs' witnesses as to the fact that in the past there had been downpours of equal violence is open to the objection that it was not given by scientific men and based upon scientific data, and that it must have been to a greater or lesser extent an expression of opinion merely, still defendant's nonscientific testimony was open to the same objection, and was equally unreliable. The fact remains that what little scientific data defendant did furnish was absolutely inconclusive, and could well have been repudiated by the jury. The defendant, in short, attempted to show, and no doubt did show, by the testimony of the superintendent of the weather bureau, that 4.03

inches of rain fell from 1 o'clock in the morning until 10 o'clock in the forenoon. It also showed that the weather bureau was first established at Dickinson in 1892, and that the largest quantity of rain that had ever fallen in any twenty-four hour period since that time was on May 22, 1903, when 2.6 inches fell; that the average annual precipitation in this vicinity was 15.4 inches and that the average rainfall per twenty-four hour period in the last ten years was $2\frac{1}{100}$ of an inch, without counting the days it did not rain. The trouble with this evidence is that there are no records of the precipitation during any hour or series of hours during any of the years mentioned, but only the rainfall during twenty-four hour periods, and it may very well have been that, though the rainfall in 1914 during a twenty-four hour period was very much greater than that of any twenty-four hour period in the past; that in the past there had been during certain hours and for limited times much greater downpours. This is made perfectly clear by the testimony of the superintendent of the weather bureau to the effect that about two years before the trial there had been a downpour of $1\frac{1}{2}$ inches of rain in a period of only fifteen minutes. It is also worthy of notice, and a fact that could well have been considered by the jury, that although it was admitted that official and scientific records were taken at the weather bureau at 6 o'clock in the morning, and although there was testimony to the effect that the flood had begun to abate after that time, in so far at least as plaintiffs' property was concerned, no attempt whatever was made to introduce these records in evidence, and the defendant, instead, merely relied for his scientific data on the remembrance of the witness Waldron as to the observations he had made four hours later and at 10 o'clock in the morning. Even if his remembrance and observations were correct, he testified merely as to the record of a nine-hour rainfall. The testimony of the witnesses Leonberger and Butler would lead us to believe, or at any rate the jury was justified in believing from this testimony, that the flood was at its height, as far as the storm was concerned, at about 3:30 in the morning, while the witness White testified for the defendant that there was an extra heavy rainstorm at 6 o'clock. It is also clear that records which were made at 6:30 A. M. could easily have been obtained, as the weather bureau was only 2 miles from the city of Dickinson, where the trial was held.

We hardly see, therefore, that the defendant has met the burden of proof; that is, of showing the extraordinary nature of the storm, and that the same could not have been anticipated.

We do not agree with its counsel, at any rate in this western country, that the fierceness and intensity of a storm must be determined by the amount of rain which falls in any given twenty-four hour period, or with his conclusion that because in the past, no such volume of rain had fallen in any twenty-four hour period as fell in the twenty-four period and prior to 6:30 o'clock in the evening of July 28, 1914, that there had not been prior to such times as equally violent storms or downpours extending over lesser periods, and it is a matter of common knowledge that it is the cloudburst or sudden downpour that taxes the requirements of drains and sewers.

As far as the severity of the storm is concerned and its unusual character, Nelson G. Lawrence testified for the defendant that he had lived in Dickinson since 1883; that he remembered the storm of July 28, 1914; that he got up at about 1 o'clock; that the water covered the streets; that it was the worst storm that he had ever known since he had been there. He, however, testified on cross-examination that he could remember nothing whatever of the storms of 1912 or 1909. He also testified that storms in the vicinity were usually of short duration.

Oliver Whaley testified that he had lived in Dickinson since January 1, 1911; that he got up in the neighborhood of 1 o'clock; that the water covered the sidewalks on Second avenue; that there was a recession of water about daylight, he thought; that there were three periods of severity between 1 and 7 o'clock; that it was an unusually severe rain storm; that he had never seen one that would compare with it for severity for the same length of time; that the storms were generally of short duration; that this storm was severe and of long duration; that he observed the storm between 1 and 8 o'clock. He, however, testified that in the past he had often seen the waters cover the crossings and come up on the sidewalk on the south side of his house; and this had been so during the last year, the water extending a distance of 10 or 12 feet north and about the same distance east on a low corner; that on the morning of the storm when he went down town, the crown or the center of the street was in view. The gutters were full of water; perhaps 10 feet of the center of the road was visible immediately in front of his residence and to the east of Second street.

The witness Bert A. Condit testified that he was a civil engineer; that the drainage area of the district was 168 acres; that the elevation in the center of Villard street was 99.75 feet and the elevation of the property line and the sidewalk in front of plaintiffs' store was 99.55 feet; that the elevation taken 15 feet to the west of the building was the same as in front of the store; that on account of the fact that the lot was somewhat lower than the center of the street the water coming down that street, if the gutter was overflowed, would cover the lots.

The witness F. J. Taylor testified that the tracks were constructed according to the most-approved method; that the 48-inch pipe which extended under the track was sufficient to take care of a rainfall of 3 inches per hour. That with a rain-fall of 3 inches per hour there would be a run-off of 123 cubic feet per second, and that the culvert in question would carry off 177 cubic feet per second. (See testimony given before.)

The witness Waldron also testified that he thought the precipitation for July 26, 1914, was 1.16 inches; that he could not say accurately, but he thought it rained two or three hours.

Q. Well, then, you do not know of your own knowledge how long a time it rained?

A. It could not have been much more than that. It commenced to rain at 1 or 2 o'clock in the afternoon. An observation was taken at 6.

Q. Were you out of town during the 28th?

A. Part of the time.

Q. What part of the time?

A. I got here on delayed No. 1, about 10 o'clock in the morning.

Q. About 10 o'clock?

A. No, it was earlier than that, about 9 o'clock or a little after nine.

Q. So that you weren't here during the early morning hours?

A. No, sir.

Q. From 12 to between 9 and 10?

A. No.

Q. Were you here during the 27th, the day preceding?

A. No, I wasn't, a part of the day I was.

Q. When did you leave?

A. I left on No. 8 in the morning. The train was on time.

The witness Kittleson testified that he had been in the country for seven years; that he got up on the morning of the 28th at about 1 o'clock and watched the rain; that he characterized the rain as compared to other rains as equal; that he would not testify that he had seen a rain of this amount and extending over this period of time in this country before; and in answer to the question, on cross-examination: "You mean to testify, don't you, Mr. Kittleson, that you have seen rains where the rain came down just as heavy at one time, is that what you want to testify? You don't mean to testify that you have seen a rain of this amount and extending over this period of time? A. No, sir." He specified that he had seen a similar rain and as heavy a downfall about July the 11th, 1912.

The witness Hughes testified that he had lived in Dickinson for nine years last past; that he observed the rain; that he had seen other rains where there was as much rainfall in the same length of time, on two occasions anyway—one in the summer of 1912—July, he thought. He did not measure the amount of rain that fell on these occasions; that he judged by the amount of water that was on the ground, but the storm in July, 1911, lasted about half an hour.

There is also evidence that the ditch or natural drain way before it enters into the culvert was about 2 or 3 feet at the bottom and 6 or 7 feet at the top, and that if the water was level and there was $1\frac{4}{10}$ feet of water at the property line in front of Soules & Butler's store, there would be a little better than 2 feet of water over the top of the culvert. Assuming this to be true, it is perfectly clear that if the original pile bridge had been maintained, or the culvert had approximated the size and volume of the original drain or ditch, that the water might very well have all been carried off. These facts were, at any rate, for the jury to pass upon, and we cannot say from the record that they were not right in holding that it was the lack of capacity in the culvert to carry off the water that was the proximate cause of the damage, or that similar downfalls of rain had not occurred in the past.

We have carefully examined the cases which are cited by counsel for appellant on the question of the proof and as to what constitutes unprecedented storms, but are merely convinced by them that in the case at bar the matter was one for the jury to pass upon. All that

the cases of Pittsburg, Ft. W. & C. R. Co. v. Gilleland, 56 Pa. 445, 94 Am. Dec. 98, and Ohio & M. R. Co. v. Thillman, 143 Ill. 127, 36 Am. St. Rep. 359, 32 N. E. 529, held was that it was error to instruct the jury that the fact that in the one case the three storms and in the other the two storms which occasioned the damage occurred in rapid sequence rendered them usual and not unprecedented, and with these holdings we can take no exception, as the courts in both cases expressly stated that the matters in controversy were for the jurors themselves to consider and to pass upon. In the case of Greiner v. Alfred Struck Co. 161 Ky. 793, 171 S. W. 405, the court held that the proof conclusively showed that the storm which had lasted for two days was so unusual or extraordinary that it could not have been guarded against by ordinary prudence. In it, however, although the witness testified that there had been as great a flood in a previous year, this evidence was not only disputed by the records of the weather bureau, but the witness himself admitted that in the preceding year the water course did not overflow its banks so that there was no reason for the defendant to anticipate that it would do so on this particular occasion. In the case at bar there is evidence which tends to show that on previous occasions there had been other floods, though not as extensive, in which the culvert had been insufficient.

All that the other cases cited by counsel for appellant do is to emphasize and repeat in various forms the general and well-established propositions that a railway company is not liable for damages occasioned by unprecedented storms; that even if a sewer is defective the defendant cannot be held liable unless that defect is the real and producing cause of the injury, and that even though there is negligence on the part of the defendant, if the act of God is so overwhelming as of its own strength to produce the injury, the defendant cannot be made responsible; that it is not the duty of the defendant to prepare against unprecedented storms, and that where it appears that the storm is unprecedented the burden of proof is upon the plaintiff to show that the damage would not have resulted except for defendant's negligence.

We may concede each and all of these propositions, yet that concession would not justify a reversal in the case which is before us. The cases cited by counsel themselves show that the burden of proof is upon the defendant to prove the unprecedented nature of the storm. See

Memphis & C. R. Co. v. Reeves, 10 Wall. 189, 19 L. ed. 912. And on this question there was a clear conflict in the evidence which left it for the jury. On the question of negligence and the adequacy of the culvert, there was also a conflict, and this was also a question for the jury. Almost all of the cases cited by counsel pass upon instructions which took these matters from the jury. None of them seem to cover a case such as that before us, where the jury was properly instructed and where there is a serious question as to whether the railway company has met the burden of proof of showing the unprecedented nature of the storm. The term "extraordinary floods" has been defined as meaning "such floods as are of such unusual occurrence as could not have been foreseen by men of ordinary experience and ordinary prudence. Ordinary floods are those the occurrence of which may be reasonably anticipated from the general experience of men residing in the region where such floods happen." Gulf, C. & S. F. R. Co. v. Pool, 70 Tex. 713, 8 S. W. 535; 3 Words & Phrases, 2628. The question to be decided was: Considering the rains of the past, the topography and climatic conditions of the region, and the nature of the drainage basin, the fact that in the past heavy downpours had occurred and on one instance 1½ inches of rain had fallen in only fifteen minutes of time, the baked and arid nature of the district, its absence of trees or anything that would prevent water from rapidly running off, would and should a reasonably prudent man have foreseen the danger and provided against it? We cannot say that the proof was so conclusively in the negative that the question became one of law merely, which had to be decided in favor of the defendant, and that it was not one which was properly submitted to the jury.

Nor can we say that the proof otherwise shows that the culvert was sufficient, and that the flooding of the property of plaintiffs was, in fact, occasioned by the fact that the property was situated in a depression and lower than the street, and not by the smallness of the culvert. There is evidence, it is true, that the center of Villard avenue and in front of plaintiffs' property was some .21 of a foot above the property line of plaintiffs; and that the water coming down the street would, if the gutters were overflowed, flow upon plaintiffs' property. It is to be remembered, however, that west of plaintiffs' property was Second avenue East, east of their property was First avenue East,

34 N. D.—3.

and east of First avenue East, Sims street; that north of their property was First and Second streets. It was shown that there was a fall from the intersection of First avenue East and Villard avenue of some .6 of a foot to the block towards the east, and that there was no point in the street that was higher than First avenue and Villard avenue; that the intersection of First avenue and First street is .9 of a foot higher than Sims street; that along First avenue there is a large ditch about 2 feet below the curb line of the sidewalk; that the water at the time of the flood came above the property line of Soules & Butlers' about 11 inches. There is also evidence that from a short distance east of plaintiffs' property, clear on the east side of Second avenue East, which is about $\frac{2}{10}$ of a foot lower than plaintiffs' property line, most of the water coming down from the north, that is, coming down First avenue East and Sims street, does not travel straight down to Villard avenue, but turns east on First street and goes over to Second avenue East and then south, so that the bulk of the water from the territory west of Soules & Butlers' would flow along First street until it struck the street east of the lumber yard, then down and across the street and out through the culvert.

Nor can we say that the proof is by any means conclusive that the sewer was blocked by the culvert crossing, and that this was an obstruction for which the city, and not the railway company, would be responsible. Such obstruction, indeed, might possibly have existed, but the evidence seems to show that such was not the fact. On this question the witness Hughes testified positively that he saw the culvert at 5 o'clock in the morning, and that he saw one of the plank crossings that was used to cover the culvert between the streets, about 2 feet above the culvert and 2 feet back in an indent; that at the time there was too much water to see the culvert itself; that the plank or culvert crossing that he saw was slanting up against the bank, and that the water was holding it there.

Q. You could not see whether that portion was over the mouth of the culvert?

A. I couldn't see how it could lay over the culvert in the position it was laying. It was laying on a slant.

Exception is taken to the instruction to the jury that "if you believe that the plaintiffs are entitled to recover as heretofore instructed, then

it is your duty to determine the amount of damages sustained by reason of the flooding of these premises, and they are entitled to make matters whole. If you find in favor of the plaintiffs, then they are entitled to recover such damages as they have reasonably suffered by reason of the negligence of the defendant to provide a suitable and sufficient culvert to take care of the water that naturally, through its natural course, would drain through that territory." It is claimed that the above quotation comprises all the instructions to the jury on the measure of damages, and that no requests for instructions on the measure of damages were in this case submitted to the trial court by either plaintiffs or defendant. "It is our contention, however," says counsel for the defendant in his brief, "that the failure of the court to instruct the jury as to the measure of damages in this case, *i. e.*, how they were to ascertain the damage and what they had the right to consider, is fatal. And we contend this is error regardless of whether or not such instruction was requested." Defendant and appellant contends that "the rule in civil cases is that, where there is an established rule of law as to the measure of damages applicable to a particular case, the judge ought to inform the jury what the rule really is, and that a failure to do so is a ground for a new trial. So important is this rule that, although nondirection is in general no ground for a new trial in civil cases, unless a proper instruction is requested and refused, yet the failure to instruct the jury as to the rule of damages has been held ground for a new trial, even where the specific instruction was not asked." "A reading of the authorities above cited," counsel also says, "will show how logical the conclusion is. We had the right to expect that the court would give to the jury some little instruction on the measure of damages, the law of the case with reference to the damages, and did not have to take chances, because the failure to request instructions, that he would give the jury free rein, and let them do just as they pleased in determining the amount of plaintiffs' damage, or what they would be entitled to do to 'make matters whole.' Our complaint is that the jury should have been instructed as to how they could determine the amount of damages, if any, the plaintiffs were entitled to. And there is testimony in the record in regard to certain damage plaintiffs suffered, and there was no proof to show the amount of that damage."

There appears to be no merit in this objection. Almost identically the same instruction was given in the case of Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 22 L.R.A.(N.S.) 789, 120 N. W. 884, where the court held that, in the absence of any requested instruction on the subject, the measure of damages was sufficiently defined.

The next specification of error is that the court erred in allowing a certain witness to testify as to the value of the property injured and its depreciation in value on account of such injury, it being contended that he was not properly qualified to so testify. . We think, however, that there is no merit in this objection. The witness had worked in a hardware store for at least seven and a half years; he was manager of the hardware store of the plaintiffs and had been such for some time. During such time he had done all the buying for the firm, and when new goods were received by them for sale, marked the new prices on them. He had been with the stock of goods all of the time, both before and after the flood. If such a man is not competent to testify as to the value of goods, either new or damaged, we do not know who would be. This, we must remember, is not such a case as that which was passed upon by us in Fisher v. Smith, 32 N. D. 595, 156 N. W. 242, and where the witness testified positively that he did not know the value of secondhand goods, and was hardly in a position to know such value.

The next specification of error relates to the admission in evidence of testimony in regard to the nature of a bridge which had formerly been constructed by the railway company over the swale or ravine, and which testimony, it is claimed, was not relevant or material, and did not tend to prove any issue in the case, and also to allowing evidence as to whether it would have cost any large sum to have constructed larger culverts; also whether it would have been a difficult engineering feat to do so. Counsel for defendant argues that "the above specifications, it will be noted, relate to testimony introduced by plaintiffs, both direct and on cross-examination, relating to the fact that some time ago the defendant had maintained a trestle bridge where the culvert in question now is, that the trestle bridge was 14 or 16 feet wide and always took care of the waters that came down, that it would not cost a great deal to put a few extra culverts under the track, and they could be put in without a great deal of difficulty. We submit that

the court erred grievously in letting such testimony as this go in over
our objection, and that it was very prejudicial.   The question at issue
here is whether or not the culvert we had under the track on July 28,
1914, was adequate; and the size of a culvert kept there before, or the
size of a trestle bridge kept there before, or the fact that such bridge
was maintained there, or the fact that more culverts could be put in
without much expense or without much trouble, was entirely immaterial
and wholly collateral to the issue.   And these points were touched
upon and emphasized for the sole purpose of prejudicing the jury and
giving plaintiffs something to argue to the jury.   They went to the
jury with the argument that if we had kept the trestle bridge, or put
in a few more culverts at a few dollars' cost, these plaintiffs would not
have suffered this great loss.   This is an attempt to prove negligence
by collateral matters, and every court in the land has said this is not
permissible."

We can see no merit in this objection.   One of the immediate ele-
ments of the case was whether the swale or ravine was a natural drain
way, whether it drained the area in question, the amount of water
which ran therein, and the topography generally of the locality.   The
fact that a trestle bridge had been constructed over the ravine and
was necessarily constructed had much to do with proving this fact.
Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811;
Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 22 L.R.A.(N.S.)
789, 120 N. W. 884.   Although this evidence might have been improp-
erly used in the argument, we do not find that any objection was made
to that argument while it was being made, or that any instructions
were asked thereon by the defendant.   If every misuse of testimony
which is made upon the argument can be made a ground for reversal
when no objection is made thereto upon the trial and no instruction
asked thereon, but few verdicts would stand.

As far as the cost of the culverts is concerned, we do not consider
this testimony at all irrelevant.   It all goes to show whether or not
the defendant was guilty of negligence in not providing proper pre-
ventives against heavy downpours.   Surely one should not be allowed
to complain when sued for the failure to provide sufficient culverts,
because proof is introduced which he is at liberty to repudiate that
those culverts could have been easily furnished.

Counsel for defendant and appellant also objects to the admission of testimony that the premises of the plaintiffs were flooded prior to July 28, 1914. We can see no error in the admission of this testimony. It all went to show the necessity for a sufficient culvert, and although some of it relates to a period before the particular culvert was constructed, it none the less tends to prove that fact as well as the course of the flow of the water from the drainage district.

Objection is also made to the action of the court in sustaining plaintiffs' objection as follows:

Q. Do you remember whether or not that cistern was flooded by the surface waters on that day?

Counsel for plaintiffs: I object to that on the ground that it is entirely immaterial, unless it is shown to be in this drainage basin or some way connected with it.

The Court: Objection sustained.

And the question: You may now tell us whether or not this cistern was flooded by surface waters on the 28th day of July, 1914.

Counsel for plaintiffs: Objected to on the ground that it is wholly immaterial, and the comparison would be of no benefit to the jury.

The Court: Objection sustained.

This testimony was rejected by the trial court apparently on the theory that it was not competent because the reservoir in question was located in a different basin than the one in question, that is to say, located in a different hollow, although it was shown that the basins were topographically nearly the same. We are inclined to think that there is some merit in this objection. There must be some limits, however, to the proof in every case, and the evidence was merely cumulative, and all that it could possibly tend to show was the action of the water in the vicinity and the character of the storm. We can hardly reverse the judgment on this account.

Error is predicated on certain portions of the instructions in which the jury were told that "every owner of land may lawfully improve his property by doing what is reasonably necessary for that purpose, and, unless guilty of negligence in the manner of execution, will not be liable for an adjoining property. In other words, the railroad company has a right to fill a grade as it is done and established by the evidence

in this case, provided no damage results to the adjoining property by reason of such establishing of such grade," and: "The court instructs you as a matter of law that if the railroad company fills a grade over and across any natural drainage way, it is the duty of the railroad company to provide suitable and sufficient means for taking care of the water along such drainage way." Also: "Now you must determine whether or not in the construction of this grade and the culvert providing for the care of surface water, whether or not the company was negligent and failed to do something that an ordinary prudent man would not have done under the same or similar circumstances." And: "Gentlemen, the plaintiffs must establish that the defendant was negligent in establishing that grade and providing an insufficient culvert to take care of the ordinary drainage water under ordinary circumstances; and, second, that the culvert was not obstructed; and, third, that it was not an extraordinary freshet, and if you find those facts then your verdict must be in favor of the plaintiff, and then determine the amount of damage suffered, if any, by reason of the flooding of these premises and the injury to their property by reason of such flooding; but if you believe that the defendant is not guilty of any negligence in the construction of his right of way and culvert in question, and you believe that the damages was the result of an extraordinary freshet, then your verdict must be in favor of the defendant."

It is also claimed that the court erred in its instruction to the jury, "in that they did not cover the law of the case necessary so that the jury can intelligently decide the issues before them, and the said instructions are ambiguous and well calculated to mislead the jury." It is also claimed that "the court erred in that the instructions given did not fully cover the issues in the case, the court wholly failing to instruct, or not sufficiently instructing, on the following issues: (1) Upon the issue as to whether or not the swale or ravine in question here was a natural water course, no definition of a natural water course having been given them so they could determine this question intelligently. (2) Upon the question of the measure of damages, no instruction whatsoever having been given the jury as to what constituted the measure of damages, if any, plaintiffs had suffered, having been given."

We find no merit in these objections. As far as the natural water course is concerned, we are satisfied that the evidence is so conclusive

that the court would have been justified in peremptorily instructing the jury that the swale or ravine was a natural water course.

As far as the other alleged errors are concerned, including the one in which the court says: "In other words, the railroad company has a right to fill a grade as it is done and established by the evidence in this case, provided no damage results to the adjoining property by reason of such establishing of such grade,"—we do not believe that any prejudice was occasioned. The offending words were preceded by the instruction that the court "instructs you that every owner of land may lawfully improve his property by doing what is reasonably necessary for that purpose, and unless guilty of negligence in the manner of execution will not be liable for an adjoining property," and were followed by the words: "The court instructs you as a matter of law that, if a railway company fills a grade over and across any natural drainage way, it is the duty of the railway company to provide suitable and sufficient means for taking care of the water along such drainage way. Now, in this particular case, the gist of the action is to determine whether or not, in the construction of the right of way and establishing the culvert in question, the company, the defendant in this action, was negligent in such construction. If the company is negligent then the verdict must be for the defendant. Negligence, as that term is used in this charge, means the failure to exercise ordinary care. Negligence consists in doing something which a person of ordinary prudence and care would not do or would not have omitted to do under like or similar circumstances. Now, you must determine whether or not, in the construction of this grade and the culvert providing for the care of the surface water, whether or not the company was negligent and failed to do something that an ordinarily prudent man would not have done under the same or similar circumstances. Now, in order to determine whether or not this defendant was negligent, it will be necessary to determine from the evidence the size of the culvert, and take into consideration the drainage area and all the circumstances surrounding as to whether or not such culvert would, under ordinary circumstances, take care of the water of an ordinary rain storm and without injury to the adjoining landowners. If you believe from the evidence, and it is required to be established, that the proximate cause of the injury to these plaintiffs was the result of this negligence of the defendant;

if you believe from the evidence that the culvert was capable and sufficient to take care of the water during this storm, and that by reason of the same being interfered with by an obstacle over the mouth of the culvert that the water was prevented from escaping through the culvert, —the defendant company is not liable for injuries resulting by the obstruction of the mouth of the culvert; and if that contributed and was the cause of the injury sustained by reason of the obstruction of the culvert, then the defendant company is not liable for what may have resulted to the plaintiffs by reason of that fact. Now, the next question to be determined is whether or not in the storm that occurred on July 28, 1914, at which time the plaintiffs are alleged to have suffered the injuries complained of, such storm was an extraordinary freshet; if you believe from the evidence that the storm of July 28 was an extraordinary freshet, then the company is not responsible for injuries sustained, it being contemplated under the law that it was an act of God, and the defendant cannot be held responsible, and the burden is thrown on the defendant to establish this fact by a fair preponderance of the evidence, and, as before indicated, we mean by a fair preponderance of the evidence a greater weight of the evidence; that the defendant must establish that it was in fact an extraordinary freshet. In that connection the jury are instructed that the burden then, as indicated, is upon the defendant to prove by a fair preponderance of the evidence that this was an act of God and was an extraordinary freshet, and was the entire cause of the plaintiffs' loss, which, if so, would in itself establish the absence of negligence on the part of the defendant company, and if the defendant proves by a fair preponderance of the evidence that this was an extraordinary freshet, then that shows that the defendant is free from negligence and is entitled to a verdict. Gentlemen, the plaintiffs must establish that the defendant was negligent in establishing that grade, and providing an insufficient culvert to take care of the ordinary drainage water under the ordinary circumstances; and, second, that the culvert was not obstructed; and, third, that it was not an extraordinary freshet; and if you find those facts, then your verdict must be in favor of the plaintiffs, and then determine the amount of damage suffered, if any, by reason of the flooding of these premises and the injury to their property by reason of such flooding; but if you believe that the defend-

ant is not guilty of any negligence in the construction of his right of way and culvert in question, and you believe that the damages was the result of an extraordinary freshet, then your verdict must be in favor of the defendant."

We do not very well see how these instructions could have been very much clearer. They made it absolutely clear to the jury that the railway company could only be held liable if guilty of negligence, and that the test of that negligence was the care of an ordinarily prudent man in similar circumstances. They made it clear that the defendant could only be held liable in case the storm was not unprecedented or extraordinary. The court clearly stated that "if you believe from the evidence that the storm of July 28th was an extraordinary freshet, then the company is not responsible for the injury sustained." In addition to this a special question was submitted to the jury on this very proposition. The instructions must be taken as a whole, and not in isolated sections, and the jury must be presumed to have been composed of intelligent men. Taken as a whole, the instructions were, in many respects, more favorable to the defendant than the law would warrant.

Nor can we hold, as a matter of law, with the contention of counsel for appellant, that "negligence was clearly disproved by their proof that the railroad tracks, embankments, etc., were constructed in the ordinary and usual manner, and in the most approved manner known to railroad engineers, and that the 40-inch pipe which extended under the track and constituted the culvert was sufficient to take care of the ordinary and usual rainfall in the drainage basin. In other words, that from a rainfall of 3 inches per hour, there would be a run-off of 320 cubic feet per second, and that the capacity of the culvert was 177 cubic feet per second." This testimony was, in fact, given, but the witness admitted that his computation as to the run-off from the drainage area was figured from a general formula merely; that it was based on soil in a dry condition when some of the water would be taken up by seepage, and on the presumption of ordinary street roads, and not roads which were hard and impervious to water. He specifically stated that he did not know without computing how many cubic feet of water would fall upon 168 acres of land if there was a rainfall of 3 inches of water per hour. This evidence would, of course, be con-

clusive if there was any proof of the amount of rain which actually fell during the hours in which the damage was done, and which actually fell during any similar period in the storms of the past, and that the areas from which the formula was taken were similar in topography and as to soil to that under consideration in the case at bar. It must be clear, however, that no general formula can be made to apply in such cases, as the drainage through a pipe or culvert from a drainage basin in a level district such as the Red River Valley would be entirely different from the drainage of a hilly basin such as that to be found at Dickinson. We believe that the case was properly submitted to the jury.

The judgment of the District Court is affirmed.

PER CURIAM (filed April 26th, 1916). After listening to a reargument in the above case, the court still adhere to the opinion above expressed.